[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15581

_____

D.C. Docket No. 8:92-cv-00539-EAK-EAJ

CARL PUIATTI,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 15, 2013)

Before HULL, PRYOR and MARTIN, Circuit Judges.

HULL, Circuit Judge:

Carl Puiatti, a Florida inmate under a death sentence, filed a 28 U.S.C.

§ 2254 petition for a writ of habeas corpus that challenged his convictions and

death sentence on multiple grounds.  The district court first granted his petition on one ground and did not consider other issues, and we reversed the district court's decision and remanded with instructions to consider the other issues raised in the petition.  See Puiatti v. McNeil, 626 F.3d 1283 (11th Cir. 2010).

On remand, the district court held an evidentiary hearing, and denied Puiatti's remaining claims.  We granted a certificate of appealability on one issue: "[w]hether trial counsel rendered ineffective assistance to Puiatti in the penalty phase of his capital murder trial in allegedly failing to investigate and present mitigation evidence."  Having considered the state court record, the evidentiary record in the district court, and the parties' submissions, and with the benefit of oral argument, we affirm the district court's denial of Puiatti's § 2254 petition.

## I.  CRIME AND CONVICTION

### A.    1983 Crime

On August 16, 1983, Puiatti and Robert Glock kidnapped, robbed, and murdered Sharilyn Ritchie.  Puiatti (age 20) and Glock (age 22) confronted Ritchie as she got out of her car in the parking lot of a shopping mall in Bradenton, Florida.  Glock pulled out a .38 pistol and forced Ritchie into the backset of her car at gunpoint.  Puiatti and Glock got in Ritchie's car, Glock took $50 from Ritchie's purse, and Puiatti drove them to Ritchie's bank, where they made Ritchie cash a $100 check.  Then Puiatti drove Ritchie more than 60 miles, to an orange grove

2

outside Dade City, Florida.  Puiatti took Ritchie's wedding ring and left her at the roadside.

After driving away for a short distance, Glock said he thought they should kill Ritchie, and Puiatti agreed.  Puiatti turned the car around, and when the car pulled abreast of Ritchie, Puiatti shot her twice from inside the car.  Puiatti began to drive away, but when Glock saw Ritchie was still standing, Puiatti handed the gun to Glock, turned the car around, and drove by Ritchie again.  Glock shot Ritchie.  When Ritchie still did not fall, Puiatti, still driving, made a third pass and Glock shot Ritchie again.  Ritchie collapsed and died from her injuries.

Four days later, on August 20, 1983, Glock and Puiatti were arrested in New Jersey on unrelated charges while driving Ritchie's car.  New Jersey state troopers discovered that Puiatti and Glock were traveling in a vehicle stolen from a murder victim.  The state troopers found a firearm inside the stolen vehicle and later determined that the weapon was used to kill Ritchie.  The state troopers alerted Florida authorities of these discoveries, and, with the assistance of detectives from Florida, questioned Puiatti and Glock about Ritchie's murder.

While still in New Jersey, both Puiatti and Glock separately confessed to robbing, kidnapping, and murdering Ritchie.  After being extradited to Florida, Puiatti and Glock each signed a joint statement confessing to their crimes and resolving minor inconsistencies in their individual confessions.

**B.    1984 Guilt Phase**

At Puiatti's and Glock's joint trial in 1984, Puiatti was represented by two attorneys from the state public defender's office—William Eble and Howardene Garrett.  Eble was primarily responsible for the guilt phase, while Garrett mainly handled the penalty phase.

At trial, the State's witnesses testified about the discovery of Ritchie's body, the ensuing police investigation, the extent of Ritchie's injuries, the cause of her death, and the New Jersey traffic stop that led to Puiatti's and Glock's arrests.  The State introduced Puiatti's and Glock's separate confessions, and their joint confession.  Neither Puiatti nor Glock presented evidence.  In their closing arguments, neither co-defendant contested guilt; rather, both argued that the evidence supported a conviction for second-degree, not first-degree, murder.

The jury found Puiatti and Glock guilty of first-degree murder, kidnapping, and robbery with a firearm.

## II.  1984 PENALTY PHASE

In their 1984 joint penalty trial, the jury, by an 11 to 1 vote, recommended a death sentence for both Puiatti and Glock.[1]  In 2001, Glock was executed.  The sole issue here involves the investigation and presentation of mitigation evidence as to Puiatti.  On appeal, Puiatti's primary claim is that his counsel's pre-trial

---

[1] In Glock's appeal, we explained the Florida capital sentencing procedures in place during their 1984 trials.  See Glock v. Moore, 195 F.3d 625, 627 n.1 (11th Cir. 1999).

investigation was constitutionally deficient because his counsel did not discover his history of child abuse.

To evaluate this claim, we examine the pre-trial investigation by Puiatti's counsel, Garrett, to determine what steps she took to investigate and develop potential mitigation evidence. At the outset though, it is important to note that: (1) no mental health expert ever told Garrett that he or she suspected Puiatti was abused as a child; (2) in all the records trial counsel received, including school, medical, and military records, there was no indication that Puiatti was abused as a child; and (3) Puiatti and his family members never mentioned child abuse.

## A.    Pre-Trial Investigation of Mitigation Factors

Trial counsel Garrett took primary responsibility for investigating Puiatti's background for mitigating evidence, and she used the assistance of an investigator, Leonard Harris. As outlined below, Garrett: (1) met with Puiatti repeatedly and instructed him to describe his background in detail; (2) met with Puiatti's family members and asked them about Puiatti and their relationships; (3) obtained records regarding Puiatti's education, military service, and medical history; and (4) retained two licensed mental health professionals to evaluate Puiatti and form their own opinions about his background and mental health.

In developing a mitigation strategy, Garrett had Puiatti write a history of his life. In that "life history," Puiatti advised that his childhood was "pretty normal,"

5

he "never wanted for anything," and his parents "were pretty fair and didn't usually punish or spank [him] without reason." Garrett could not remember what directions she gave Puiatti before he wrote his life history. However, she testified that he "absolutely would have been instructed to be truthful."

As Garrett described it, Puiatti's life history contained various references to the ways that "Puiatti felt very indebted to [his parents'] care for him." For example, Puiatti described his parents' efforts to obtain counseling for him after his drug addiction caused him to drop out of high school. Puiatti wrote: "Well finally my parents insisted I go see a counselor, which I was opposed to but went ahead anyway. Before I could get to[o] involved with it we moved to Florida."

In his life history, Puiatti also wrote: "I got stopped and got a ticket for driving while my license was suspended and had to pay a fine. All this time my parents [G]od bless them were trying to help me, but all I did was l[i]e and get high all the time." Garrett testified that this statement was consistent with "the way the parents and Carl both saw it, that they were loving parents that were trying to help him and that Carl . . . screwed up."

Garrett's notes indicated that she discussed with Puiatti "reasons for poss[ible] mit[igation]." Two days later, Garrett again met with Puiatti. Garrett's notes indicated that she discussed Puiatti's background at length in an attempt to develop a mitigation strategy.

6

Based on her talks with Puiatti and his writings, Garrett identified themes of Puiatti's life that she hoped would form a coherent mitigation strategy. Garrett made a chart of these themes, listing various events that caused Puiatti's "hopelessness," including, inter alia, Puiatti's drug and alcohol abuse, his failed marriage, and his being on probation. Garrett noted that Puiatti had a "childlike relation[ship] to parents" and that they cared "for him more and more."

Garrett met with many of Puiatti's family members. In 1983, Garrett spoke on the phone with Puiatti's mother, Linda Puiatti ("Mrs. Puiatti"). Garrett explained to Mrs. Puiatti mitigating and aggravating factors relevant in death penalty cases and "the value of psych[ological] evid[ence]." In response, Mrs. Puiatti told Garrett that she feared Puiatti was "losing [his] will to live" due to emotional problems and physical disabilities.

Three days later, Garrett visited the Puiatti family home. In her notes from the meeting with Mrs. Puiatti, Garrett wrote "Angela and Jimmy, when first saw [Puiatti]—Jimmy said he thought brother was crazy." The "Angela" in her notes was Puiatti's older sister, Angela Wright, and "Jimmy" referred to Wright's former husband, James Thatcher. [2]

---

[2]At the time of Puiatti's trial, Angela was married to James Thatcher and used the surname, Thatcher. By the time of her 2012 testimony, Angela had divorced Thatcher and used the surname Wright. For clarity purposes, we refer to Angela as "Wright" throughout this opinion.

Garrett gleaned from her visit to the Puiatti family home a strong impression of how loving and supportive the Puiattis were. Garrett sent Mrs. Puiatti a follow-up letter thanking Mrs. Puiatti for her "extremely gracious hospitality." Garrett wrote that it was infrequent that families of defendants are "as supportive as you and [Puiatti's father] have been" and that Garrett and her colleagues rarely found "such a warm welcome into such a loving home."

Garrett separately interviewed Puiatti's father, Victor Puiatti, Sr. ("Mr. Puiatti") "on at least a couple of occasions." During one meeting, Garrett discussed with Mr. Puiatti an altercation that he had with Puiatti just before Ritchie's murder. In her notes, Garrett wrote: "1 very tough conversation—[Mr. Puiatti] lost temper w[ith] him[;] [Puiatti] just sat there—s[ai]d hit me Dad if it'll make you feel better."

Garrett also talked with Puiatti's older sister, Angela Wright, several times between 1983 and 1984. In 1983, Garrett sent Wright an introductory letter, advising that Garrett was "gathering any and all information, including testimony or documentary evidence of any kind that could be introduced in the penalty phase to convince the jury and hopefully the Judge that your brother Carl should not be executed for this offense." Garrett requested that Wright "begin to consider any and all information that . . . would establish what kind of person Carl is, [and] what

8

led him to the position he is presently in." When Garrett wrote this letter she had no "preconceived ideas"; she described herself as "an open book at that point."

In her notes from a 1983 conversation with Wright, Garrett wrote: "Parents paint rosy pic—not so." But, right after that comment, Garrett's notes state: "Father—bus. for self—meat mkt/deli combo—Carl started wkg there 12-13[,] dad cheated people . . . taught cheating ok." Garrett's notes mentioned that Wright purchased the family business but later discovered undisclosed debts. Garrett assumed that Wright's "rosy pic—not so" statement was based on Wright's bitterness, or "sour grapes," over the sale of the meat market.

Wright also told Garrett that: (1) Mrs. Puiatti incurred significant bills that went unpaid when the family moved to Florida; (2) Mr. Puiatti "forced" Puiatti into the Army; (3) Mr. Puiatti told Puiatti that he would "never be as smart as [Wright]"; (4) when Puiatti wanted to move to New York to live with Wright, their parents told Puiatti that Wright "didn't want him"; (5) in the previous year and a half, Puiatti's parents "more or less gave up on him"; and (6) Puiatti received "very little aff[ection] from father" and his "mother smothered him." As Garrett acknowledged, Wright was "pretty revealing" about negative aspects of Puiatti's character and background.

Although Wright was candid about certain flaws in the Puiatti family, Garrett believed that Wright could testify about the family's closeness. After

9

talking to Wright, Garrett prepared an outline of testimony that she hoped Wright would give. Garrett's outline listed "mitigating factors" for Wright to testify about, specifically, "close relationships [within] family, inc[luding] renewed closeness as a result of this tragedy."

Garrett did not limit her interviews to Puiatti's immediate family members. For example, Garrett interviewed Janice Dillage, who by 1983, was Puiatti's former wife.[3] Dillage told Garrett that during their marriage, Puiatti used the couple's income to buy drugs and alcohol and abused Dillage's daughter from a previous relationship. Puiatti threatened to harm Dillage if she left him.

Dillage also described Puiatti's relationship with his family, stating that Puiatti "picked on his younger brother and sister." Dillage recounted the same altercation between Puiatti and Mr. Puiatti that Mr. Puiatti had talked about. Garrett wrote in her notes: "father took [Puiatti] out in garage to talk—1st talking, then hollering—doesn't know for sure if father hit."

Garrett also interviewed over the telephone Puiatti's uncle, Joseph Puiatti who stated that he did not want to testify on Puiatti's behalf and that he considered Puiatti "a loser." Garrett decided not to call him as a witness.

Garrett also gathered voluminous records of Puiatti's life. Garrett sent a letter to the guidance department at the middle school that Puiatti attended in New

_____

[3]By that point, Dillage used the surname "Puiatti." However, for clarity purposes, we refer to her as Dillage throughout.

York, requesting Puiatti's school records "especially including but not limited to psychological testing and results, guidance reports, and the like." Garrett attached to this letter a release form. Similarly, Garrett wrote to Ms. Elizabeth Castisano at the guidance department of Puiatti's high school, requesting copies of his school records. Garrett stressed to the counselor that it was "very important that [she] obtain any and all information . . . on the appropriateness of penalty of life or death." She asked the counselor to identify "anyone in [the] area that might have recollections about Carl, his background, his behavior at the time one knew him, his family situation, and the like." Garrett reiterated that she was "asking if you recall anything at all about Carl, or if you know of any persons in your school that do recall anything about Carl, even though that information might not seem to be important at this time."

Garrett believed that "guidance counselors are great people to give you information about the inner relationship of families to children." She testified that guidance counselors and teachers can observe "[p]otential indications of abuse, potential indications of weird family dynamics, children with issues . . . all kinds of things." Garrett received records from Puiatti's elementary, junior, and senior high schools, which included his junior and senior high school grades and school attendance.

11

Garrett requested and obtained medical records about Puiatti, such as records from Lee Memorial Hospital regarding Puiatti's July 17, 1982 visit to the emergency room.  She obtained an intake form from the Sheriff of Lee County, Florida, where Puiatti was incarcerated awaiting trial.  Garrett attempted to obtain records of Puiatti's counseling sessions in New York, but was denied access. Garrett did obtain records of Puiatti's 1980 and 1981 military service.

In soliciting these records, Garrett was "just trying to get all the records [she] could think of that might document independently [Puiatti's] situation and his life and see what they might reveal."

Another element of Garrett's investigation was her work with two mental health experts—a forensic psychologist, Dr. Donald DelBeato, and a psychiatrist, Dr. Richard Meadows.  Garrett retained Drs. Meadows and DelBeato because, at that time, "these were two doctors that did routine competency and sanity evaluations to the Courts in Pasco County."  In a January 4, 1984 letter, Garrett made clear to Dr. Meadows that: (1) he was hired "to investigate the possibilities of defense and mitigation" in Puiatti's criminal case, rather than to perform a competency evaluation; and (2) Garrett needed for him to perform an "in-depth review" of Puiatti's background.[4]  Some of the aspects of Puiatti's background that Garrett felt Dr. Meadows might look into included: "[Puiatti's] drug use/abuse, his

---

[4]Garrett could not recall whether she sent a similar letter to Dr. DelBeato.

12

interaction with his family and other persons, his propensity towards violence or avoidance of the same, [and] the existence of any delusional or psychotic thinking." Garrett, however, did not cabin Dr. Meadows to examining only these background aspects. Rather, Garrett encouraged him to look into "any other factor which [he] might consider relevant."

Garrett provided Dr. Meadows with some context to assist him in his work. In her description of Puiatti's family, Garrett accurately set forth the information that her investigation had revealed to that point, and she did not sugarcoat the negative things about the Puiatti family that she had learned. For example, Garrett told Dr. Meadows that Puiatti came "from a relatively middle class background, raised with both parents and several siblings in the home." Garrett described the family's financial struggles, stating that Mr. Puiatti had owned several "small meat market/delicatessen stores" which failed during Puiatti's teenage years. As a result, the family moved from New York to Florida and presently lived "in a modest low-middle class situation, on a very limited income." Garrett explained sister Wright's soured relationship with her father, stating that Wright and her husband had purchased one of Mr. Puiatti's meat markets and that this transaction may have caused "some anxiety between the two branches of the family as to the source of the family's financial reverses and the responsibility."

13

Garrett did not expect Dr. Meadows to take her word for what kind of family Puiatti came from. Rather, she anticipated that he would complete his own investigation by interviewing both Puiatti and his family members. Garrett urged Dr. Meadows to "meet with Carl as soon as practicable." Garrett told Dr. Meadows that "[a]fter interviewing Carl I am sure that you will be in the best position to advise me as to what other steps you need to follow in order to best prepare your portion of the case and to reach your conclusions." Garrett suggested that Dr. Meadows contact Mr. and Mrs. Puiatti and offered to introduce Dr. Meadows to them.

Garrett concluded her letter by listing the statutory and non-statutory mitigating circumstances that she hoped to establish at trial. One of these was "[p]ositive relationships with family." Garrett did not limit Dr. Meadows to only looking for these circumstances. Rather, at the end of the letter, Garrett wrote, "any evidence of a positive, compelling, or persuasive value can be considered, and must be considered, as mitigation, therefore any theories that you develop or aspects of Mr. Puiatti's personality you might find of interest or explanatory or compelling I would ask that you point out to me."

Dr. Meadows then personally evaluated Puiatti and met with Garrett. In her notes from that meeting, Garrett wrote, "father absent a lot—rejected [Puiatti] overtly, favoring Angela 'princess.'" Garrett also wrote that Mrs. Puiatti "wore

14

pants" and "broke spoons or was too permissive." While Dr. Meadows told Garrett that Puiatti "conflicted [with] parents and siblings," Dr. Meadows also determined that Puiatti was "[e]xtremely dependent on family."

Dr. Meadows also personally contacted Mr. and Mrs. Puiatti without Garrett serving as an intermediary. Garrett's notes indicated that Dr. Meadows had a "good hour and 1/2 talk w[ith] folks" and uncovered "very overprotective behavior."

Garrett remained in close contact with Dr. Meadows throughout the pre-trial period. On March 6, 1984, Garrett sent him another letter, in which she described a recent meeting with the Puiatti family. Garrett wrote that she "found an extremely supportive and loving group" and that it appeared to her "that if anything, the ordeal of Carl's prosecution had brought the family closer." Garrett noted that Mr. and Mrs. Puiatti were very concerned about what effect Puiatti's prosecution would have on his younger brother, Victor Puiatti, Jr., who had a learning disability. Garrett's letter shared with Dr. Meadows her hope that Mr. and Mrs. Puiatti would "be persuasive witnesses on Carl's behalf."

From the facts that she uncovered in her own investigation and those that Dr. Meadows reported to her from his interviews with Puiatti and Mr. and Mrs. Puiatti, Garrett developed a proposed outline of Dr. Meadows's penalty phase testimony which she sent him. The topics that Garrett hoped Dr. Meadows would cover were

15

not limited to the Puiatti family's positive aspects. They also included: (1) "early relations with parents"; (2) "disciplinary roles of parents"; and (3) "dependence on family—to 'bail him out' of bad situations." Although there were some blemishes on Puiatti's family relationships, Garrett suggested that Dr. Meadows might testify about Puiatti's "strong supportive relationship with his family." She noted that these relationships constituted "a very positive factor, responsible for lack of violence in his nature."

Garrett sent Dr. Meadows a similar letter in preparation for his testimony before the trial judge. Garrett again suggested that Dr. Meadows talk about Puiatti's "strong supportive relationship with his family, which [was] available to him to the present time." Garrett did not stop, or mean to stop Dr. Meadows from talking about other aspects of Puiatti's background. She instructed him: "Additionally, if there are any other aspects of his background which you consider to be mitigating . . . then I would ask you to please take it upon yourself to elaborate upon those in as much length as you feel appropriate. My feeling is that, if you are in doubt whether to go into length about a point or to limit your involvement, to err on the side of going to length, if you feel it necessary to adequately explain the points you are making."

A few days later, Dr. Meadows responded to Garrett's letter. Dr. Meadows wrote that he intended to testify about "the fact that [Puiatti's] family seems to

16

have genuinely rallied very strongly around him to support him to the fullest of their abilities." Dr. Meadows hoped to "stress the fact that [Puiatti] appeared to be a bright, alert child with a lot of potentials who has demonstrated these and had the potentialities for being a contributing law abiding citizen until thwarted by various events especially from late childhood on."

Garrett engaged in a similar exchange with Dr. DelBeato, the clinical psychologist who evaluated Puiatti and testified at the penalty trial. In a letter, Dr. DelBeato explained the results of his mental health evaluation of Puiatti. Dr. DelBeato concluded that Puiatti: (1) had "moderate depression and a high level of emotional instability"; (2) had a dysfunction in the right hemisphere of his brain; and (3) had "increased impulsivity" due to his prolonged drug use. He recommended additional testing, which was performed.

## B.    Presentation of Mitigation Evidence Before the Jury

Based on the facts that her investigation revealed, Garrett presented a mitigation case at the penalty trial that revolved mainly around these four themes: (1) Puiatti's dependent personality and dominance by Glock, a more experienced co-defendant; (2) his good family background; (3) his learning disability; and (4) his drug use. Garrett's strategy was for these themes to establish statutory and non-statutory mitigating circumstances that would result in Puiatti not receiving a death sentence. See Fla. Stat. § 921.141(6)(b), (d), (g). Garrett called two expert

17

witnesses—Drs. Meadows and DelBeato—and three fact witnesses—Mr. and Mrs. Puiatti and Puiatti's older sister, Wright. We recounted their testimony in great detail in our prior opinion. See Puiatti v. McNeil, 626 F.3d at 1293–99. Here, we summarize some of their trial testimony particularly pertinent to the ineffective counsel issue here.

### 1.    Dr. Donald DelBeato

The trial testimony of Dr. DelBeato, a forensic psychologist, covered Puiatti's mental abilities, dependent personality disorder, and learning disability. We discussed in our earlier opinion Dr. DelBeato's view that "[a]s a result of his brain dysfunction, Puiatti is '[v]ery easily manipulated.'" See id. at 1293. We briefly set forth Dr. DelBeato's conclusions again here.

Dr. DelBeato opined that Puiatti was "a rather insecure young man" with "an inability to sometimes deal with stress and react appropriate[ly]." During his evaluation of Puiatti, he found no antisocial tendencies and noted that Puiatti was remorseful for Ritchie's murder. Puiatti scored a 95 verbal IQ and a 78 performance IQ. Dr. DelBeato testified that Puiatti's verbal IQ was "average," whereas his performance IQ was "borderline retarded."

Although Puiatti's remote and recent memory were normal, Dr. DelBeato found there was "a dysfunction to the right hemisphere of [Puiatti's] brain," in the frontal or frontal parietal area, which is the emotional center of the brain. Puiatti

18

had impairments in concentration and patience.  Puiatti had "emotional instability syndrome," which "could make him edgy, moody, and not know why or [be] easily influenced."

According to Dr. DelBeato, Puiatti's dysfunction expressed itself when Puiatti was under stress or under the influence of alcohol or some other toxin.  Dr. DelBeato opined that at the time of Ritchie's murder, Puiatti was under stress, and, as a result, he "would have been more easily dominated by another individual" and "more likely to do something that he would not normally do or that he would not do if he were alone."

### 2.    Linda Puiatti

Next, Garrett called Mrs. Puiatti who provided a detailed account of Puiatti's life up until Ritchie's murder.  Mrs. Puiatti described Puiatti's childhood in New York, including how Puiatti befriended children who were picked on by other kids, and how he worked in the family's meat market and deli businesses after school. After Puiatti started having trouble with his school work, Mrs. Puiatti "worked with him a lot."  She and Mr. Puiatti, "were very conscious" and she was "always home to help the children with the school work."

At age sixteen, Puiatti started "hanging out with the wrong crowd" and using drugs.  Mrs. Puiatti arranged for him to see a family counselor "three or four times."  The counselor told Mrs. Puiatti that some of Puiatti's behavior was

19

attributable to "a father and son clash type thing."  After Puiatti saw the counselor, the family moved to Florida.  Although the New York counselor recommended continuing therapy, the family could not afford to pay for additional therapy sessions.

Mr. Puiatti encouraged Puiatti to enter the military in order "to better himself."  Puiatti did so, and initially "was very happy" about his decision.  Puiatti, however, continued to abuse drugs while in the military, and, after encountering disciplinary problems, requested and received an honorable discharge.  After Puiatti returned home from the military, he was "so happy to be home, so thankful that he was [with his parents]."

At age nineteen, Puiatti met Dillage, a divorced mother of a four-year-old daughter.  Although his mother advised that he was too young to consider marriage, Puiatti married Dillage shortly after meeting her.  Mrs. Puiatti and her husband "gave them a little reception" and "did the best [they] could in [their] home]."

Despite Mrs. Puiatti's reservations about the marriage, she and Mr. Puiatti supported Puiatti and his new wife, including: (1) allowing Puiatti and Dillage to live with them before their wedding, and thus save money for wedding rings; (2) babysitting Dillage's child while Dillage was at work; and (3) allowing Puiatti and

Dillage to move in with them a second time after the wedding, when Puiatti and Dillage were unable to pay their rent.

Puiatti's marriage soon soured. Puiatti's relationship with his wife was one of "constant fighting." Puiatti and his wife separated, although they reconciled shortly thereafter and Dillage became pregnant. When Dillage was arrested for cashing stolen checks, she and Puiatti permanently separated.

After they separated, Dillage had their baby two months premature. The baby lived only two months, during which time, Puiatti was unable to see his child. Puiatti was greatly grieved, and carried with him a picture of his son.

Around this time, Puiatti was arrested for burglary. When he was released on probation, Mrs. Puiatti and her husband tried to get Puiatti help for his continuing drug problem.

Mrs. Puiatti testified about the altercation that occurred between Puiatti and Mr. Puiatti just before Ritchie's murder. Mr. Puiatti gave Puiatti a ride one evening and observed that Puiatti was "definitely stoned or something." Because Mr. Puiatti "didn't like the way [Puiatti] looked," Mr. Puiatti brought Puiatti to the Puiatti home and "laid into him." According to Mrs. Puiatti, Mr. Puiatti told his son to get his act together and "really gave it to him good." Mr. Puiatti "hollered and pinned [Puiatti] against the wall." In response, Puiatti said to his father, "'Go ahead, daddy, hit me.'" Mr. Puiatti responded not by hitting his son, but by telling

him to "'think about tomorrow'" and put his life back together again.  Puiatti did

not react negatively to this altercation.  Puiatti told his father "that he deserved it."

Mrs. Puiatti testified: "[t]hat's when my husband embraced him and told him how

much he loved him."

### 3.    Angela Wright

Puiatti's older sister, Angela Wright, testified next, describing Puiatti's drug

abuse and her own relationship with Puiatti.  Wright became aware that Puiatti was

using drugs when he was about fifteen years old.  At that time, he "was very

moody" and was "very obnoxious."

Wright talked about her own relationship with Puiatti, stating she and Puiatti

frequently argued.  Puiatti "always verbally abused but never physically—he never

struck out or hit anybody in [her] family or anyone else to [her] knowledge."

Puiatti was very depressed in the year before he committed the murder.

During this period, Puiatti nonetheless tried to make a new start for himself, and

began to work as a chef.

### 4.    Victor Puiatti, Sr.

Garrett next called Puiatti's father, Mr. Puiatti, who testified about Puiatti's

emotional state just before Ritchie's murder.  Puiatti was under a great deal of

stress to pay a fine to the state probation office.  Puiatti's probation officer told

Puiatti that if he could not pay the $10 monthly fine, Puiatti would receive a fifteen-year prison sentence.

Mr. Puiatti described the confrontation with his son a few months before Ritchie's murder. Mr. Puiatti stated: "I, um, didn't want to upset my younger children, as I pulled him into the garage, and I was quite upset with his negative attitude, and he said, 'Dad, if it would make you feel better to hit me, go ahead.'" Mr. Puiatti "kind of pushed him a little bit, shoved him against the door." Puiatti did not strike back in any way. Rather, according to Mr. Puiatti, "he just put his hands out to his sides."

### 5.    Dr. Richard Meadows

Puiatti's last penalty-phase witness was Dr. Meadows who evaluated Puiatti, interviewed Puiatti and his family members, and reviewed Dr. DelBeato's findings and the records Garrett obtained. Dr. Meadows concluded that Puiatti suffered from "several mental illnesses," including avoidance personality and "a severe dependence" on alcohol and marijuana. As we recounted in our earlier opinion in Puiatti's case, most of Dr. Meadows's testimony pertained to how these illnesses caused Puiatti to come under Glock's influence. See Puiatti v. McNeil, 626 F.3d at 1296–99. Here, we focus on the portions of Dr. Meadows's testimony that pertained to other trial counsel's other mitigation strategies—such as Puiatti's drug problem and the fact that Puiatti came from a good family.

23

Dr. Meadows opined that "it was highly suspect that [Puiatti] may have some brain damage" in light of the fact that Puiatti "had a history of several head injuries in which he probably had a concussion." Other characteristics also caused Dr. Meadows to suspect brain damage. Dr. Meadows reported that "there were a number of things about the way [Puiatti] said them and what he said that indicated . . . in a very subtle way that there was the possibility of his having brain damage." Dr. Meadows explained that one of the intelligence tests that Puiatti took showed "a wide difference" in Puiatti's verbal and performance skills. Dr. Meadows had never seen someone "with that wide a spread of differences in their ability to deal with the verbal part and the performance part who did not have some sort of brain damage." Dr. Meadows opined that Puiatti's abuse of alcohol and marijuana may have exacerbated his brain damage.

Dr. Meadows stated that Puiatti's "emotional instability, poor judgment, [and] poor impulse control" evidenced "damage in the brain[,] particularly in [the] right frontal regions." Dr. Meadows concluded that Puiatti's brain damage "was probably a contributory factor in [his] increasingly impaired judgment" as the brain damage caused Puiatti to be "more impatient –more emotionally unstable." Dr. Meadows suggested that the "progressive[] deterioration in [Puiatti's] judgment . . . would fluctuate depending on the amount of stress he was under." In short, Dr.

24

Meadows believed that, on an emotional level, Puiatti functioned like a child of ten or eleven.

Dr. Meadows also explained the factors in Puiatti's history that led to this diagnosis of avoidance personality. Puiatti "started life with some potential and interests and assets and things going for him, but problems [showed] up very early in his childhood and then he experienced a series of rather major traumas throughout his life." For example, Puiatti developed rheumatism when he was eleven or twelve and had not been able to pursue a career as a professional athlete. Dr. Meadows concluded that, by age fifteen or sixteen, Puiatti "was going down the tube socially, scholastically and [in] other areas," which was the time when his family had encountered financial difficulties. Dr. Meadows believed that the Puiatti family's move to Florida had given Puiatti hope for "another start." However, Puiatti joined the military shortly thereafter, which "was another discouraging, disheartening experience for him." Dr. Meadows described Puiatti's post-military life as "one series of boon-dogglings in which practically every area of his life . . . gave him more and more of a sense of depression, futility, numbing out his feelings, functioning less and less effectively in every area of his life."

Dr. Meadows described this "series of boon-dogglings" in detail. At the time of Ritchie's murder, Puiatti was living with his parents, did not have a permanent job, was "relying heavily on alcohol and pot," and was "still following

25

his pattern of taking in outcasts or people that were kind of misfits where he felt he would be accepted." Moreover, "[h]is marriage was breaking up" and "he had a great deal of investment in the child [who] was born of that marriage."

Dr. Meadows believed that the death of that child added to Puiatti's burdens. So too did Puiatti's financial obligations and his family commitments. Dr. Meadows stated that Puiatti was "concerned about causing . . . more problems at home . . . where his folks were trying to help him and his wife out" while also helping Puiatti's younger brother, who had a learning disability. Dr. Meadows concluded that "this concatenation of events that kept escalating . . . led him to feel more and more . . . a sense of futility and depression." Puiatti came to feel suicidal and he developed an ulcer.

Just prior to the crime, Puiatti was at his lowest point psychologically. For many years Puiatti used marijuana and alcohol heavily. Then Puiatti went three or four days without any marijuana, which could cause "an intense psychological withdrawal experience that's very unsettling to some people."

Dr. Meadows testified that it was not within Puiatti's personality profile to be a violent person. Based on his knowledge of Puiatti's childhood, Dr. Meadows believed that Puiatti "was imbued with a rather strong moral code which would not permit him in good conscious to do harm to other people."

26

Dr. Meadows concluded that Puiatti had potential for rehabilitation. One of the factors that contributed to this conclusion was the support that Puiatti's family could offer him. He testified, "It seems to me that the, what has happened has pulled the family together in a way that perhaps had not been the case previously, and they do seemed to be very concerned, to work together as a family for Carl's sake."

## C.    Penalty Trial before the Sentencing Judge

After the jury recommended a death sentence, the state trial court held a sentencing hearing. The State did not introduce any evidence or call any witnesses. Puiatti's counsel called Dr. DelBeato and Dr. Meadows who reiterated their earlier testimony to the jury. Puiatti also called Chuck Norman, a volunteer who conducted weekly group discussions on alcoholism and drug abuse in the jail. Puiatti voluntarily attended every meeting except for one when Puiatti had the flu.

Puiatti also gave a statement, expressing his remorse over the murder and love for his family. Puiatti stated, "I came from a very good and crime-free family, that doesn't deserve[] to be put through what I'm putting them through." Puiatti added that "somehow through the grace of God, they have stayed behind me through this hardship, and giv[en] me much needed support."

The state trial court sentenced Puiatti and Glock to death for Ritchie's murder. The state trial court found the existence of three statutory aggravating

27

factors, specifically that the murder: (1) "was committed for the purpose of avoiding lawful arrest, or effect escape from custody," see Fla. Stat. § 921.141(5)(e); (2) "was committed for pecuniary gain," see id. § 921.141(5)(f); and (3) "was a homicide and committed in a cold, calculated and premeditated manner, without any pretext of moral or legal justification," see id. § 921.141(5)(i). The state trial court found no mitigating factors in Puiatti's case. The state trial court's findings stated:

> Mr. Puiatti also argued that he had a strong family background and that he feels genuine remorse for his victim and that these factors should be considered by the court as mitigating factors. This court does not know if he genuinely feels remorse for his victim or not, but is convinced that he comes from a very fine family. This court does not consider either of these factors to mitigate his crime, however.

## III.  DIRECT APPEAL

On direct appeal, the Florida Supreme Court affirmed Puiatti's convictions and sentence. See Puiatti v. State, 495 So. 2d 128 (Fla. 1986). The United States Supreme Court granted Puiatti's petition as to a Confrontation Clause issue, vacated the Florida Supreme Court's decision, and remanded the case for reconsideration. See Puiatti v. Florida, 481 U.S. 1027, 107 S. Ct. 1950 (1987). On remand, the Florida Supreme Court reaffirmed Puiatti's convictions and sentence. Puiatti v. State, 521 So. 2d 1106, 1108 (Fla. 1988). The United States Supreme

28

Court denied Puiatti's petition for certiorari.  Puiatti v. Florida , 488 U.S. 871, 109 S. Ct. 184 (1988).

## IV.  FLORIDA RULE OF CRIMINAL PROCEDURE 3.850 MOTION

In 1990, Puiatti filed a motion in the state Circuit Court, under Florida Rule of Criminal Procedure 3.850, to vacate his convictions and death sentence, which that court denied.[5]  As one of his claims, Puiatti alleged that his trial attorneys provided ineffective assistance in investigating and presenting mitigating evidence for the penalty phase.

The state Rule 3.850 court found Puiatti failed to show either deficient performance or prejudice.  The Rule 3.850 court found: (1) counsel investigated Puiatti's background and retained mental health experts—both a psychiatrist and a psychologist—to examine Puiatti and testify on his behalf; (2) interviewed and presented testimony from Puiatti's family members; and (3) presented evidence of Puiatti's "dependent personality, drug use, and learning disability."  The Rule 3.850 court found that Puiatti "tried to use his good family background as a mitigating factor during his penalty phase" but "[n]ow wants to reverse his position and claim a bad family life as a mitigating factor."  The Rule 3.850 court observed that "[a]lthough all possible background information on Mr. Puiatti may not have

---

[5]Rule 3.850 provides that certain grounds "may be claims for relief from judgment or release from custody by a person who has been tried and found guilty or has entered a plea of guilty . . . before a court established by the laws of Florida", including "[t]he judgment was entered or sentence was imposed in violation of the Constitution or laws of the United States or the State of Florida."  Fla. R. Crim. P. 3.850(a)(1).

been discovered, it is apparent that his attorney presented substantial evidence on his behalf during the penalty phase."

The Rule 3.850 court acknowledged that Puiatti had filed statements from individuals familiar with his background, who could have informed his trial counsel: (1) that Puiatti "came from a home where he was verbally and physically abused"; (2) that he "did not have the normal childhood that his mother testified to during the penalty phase"; and (3) "[t]hat his mother and her promiscuous lifestyle contributed to his problems." After reciting this evidence, and noting the family members' and Puiatti's testimony that he came from a good family background, the Rule 3.850 court stated trial counsel could not be judged ineffective by hindsight.

As to prejudice, the Rule 3.850 court further determined that, in light of the aggravating circumstances (and absence of mitigating circumstances) found by the state trial court, even if Puiatti could show trial counsel's ineffectiveness, Puiatti could not establish a reasonable probability that, but for that ineffectiveness, he would have received a different sentence.

## V. APPEAL OF DENIAL OF RULE 3.850 MOTION AND STATE HABEAS PETITION

Before the Florida Supreme Court, Puiatti appealed the denial of his Rule 3.850 motion and also filed a petition for habeas corpus. The Florida Supreme

Court affirmed the denial of his Rule 3.850 motion and denied his separate petition for habeas corpus.  See Puiatti v. Dugger, 589 So. 2d 231 (Fla. 1991).

As for Puiatti's claim of ineffective penalty phase counsel in investigating and offering mitigating evidence, the Florida Supreme Court quoted at length from the state court's order and concluded that "the allegations in this instance are insufficient under the standards [for ineffective assistance of counsel] set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984)."  Id. at 234.

## VI.  § 2254 PETITION IN 1992–2010

In 1992, Puiatti filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions and death sentence.  The district court twice stayed Puiatti's case pending the outcomes of other state and federal proceedings.[6] In 2008, Puiatti filed an amended § 2254 petition (the "petition"), asserting eight claims, including (a) failure to sever Puiatti's trial from Glock's, and (b) multiple ineffective assistance of counsel claims.  One ineffective counsel claim asserted that his penalty phase counsel had "failed to discover and present critical evidence of Puiatti's history of severe physical and emotional abuse."

The district court denied § 2254 relief on Puiatti's guilt phase claims but granted relief on Puiatti's claim that his penalty phase should have been severed

---

[6]After his Rule 3.850 case, Puiatti had filed in state court three more motions to vacate his sentence which presented claims, including that he was denied effective assistance of trial counsel during his penalty phase trial.  Puiatti withdrew the first of these motions to vacate, and the state court denied the other two.

31

from Glock's.  The State appealed, and this Court reversed and remanded.  See

Puiatti v. McNeil, 626 F.3d at 1314–18.  For multiple reasons, this Court held that:

(1) Puiatti had "not shown that the state trial court's severance denial deprived

Puiatti of his constitutional rights"; and (2) the district court erred by labeling as

moot and declining to adjudicate Puiatti's other penalty phase claims.  Id. at 1307–

08, 1315.  Accordingly, we remanded for the district court to resolve Puiatti's other

claims as to his death sentence.  Id. at 1318.

## VII.  EVIDENCE BEFORE THE DISTRICT COURT POST-REMAND

On remand, the district court held an evidentiary hearing in 2012 on Puiatti's

claims of ineffective counsel in the penalty phase.  The district court considered

seventeen affidavits of family members and friends filed by Puiatti as well as the

testimony of six witnesses at the 2012 hearing.[7]

We summarize the key points in Puiatti's post-conviction evidence relevant

to the single mitigation-investigation claim here.  In doing so, we recount (1) only

the affidavits containing mitigation information that was not covered by testimony

during the evidentiary hearing and then (2) the testimony of the witnesses who

appeared at the evidentiary hearing, as well as the exhibits introduced.

## A.    Affidavits of Linda Puiatti

---

[7]The affidavits were all dated between February 20, 1990 and March 1, 1990—
approximately six years after Puiatti's trial.  The vast majority of the affiants stated that he or she
would have been willing to testify at trial about the information contained in the affidavits had he
or she been asked to do so.

32

Puiatti's mother, Mrs. Puiatti, died in 2001, and thus Puiatti relied on her two earlier affidavits from 1990. Mrs. Puiatti was primarily responsible for disciplining Puiatti when he was growing up, and often "lost [her] temper with [Puiatti] and would beat him . . . . into doing what [she] wanted him to do." Mrs. Puiatti did so because she herself was beaten and sexually abused by her own father when she was a child. Mr. Puiatti also physically abused Puiatti and the other members of the family. Mr. Puiatti verbally abused Puiatti by "always [telling] him he was stupid and worthless."

Beginning at age 13, Puiatti worked in stores that Mr. Puiatti owned and Mr. Puiatti worked him very hard. Puiatti "watched his father cheating customers and listened to him brag about this all the time" which "confused [Puiatti] about right and wrong." Puiatti, as a child, was injured in a school bus accident, causing him headaches.

**B.    Affidavit of Victor Puiatti, Sr.**

Puiatti also submitted an affidavit from his father, Victor Puiatti, Sr. ("Mr. Puiatti"), who died in 1997. Mr. Puiatti admitted that: (1) he had "a very bad temper"; (2) "often lost control of [himself] with [Puiatti]"; (3) "the only limit [he] placed on [his] assaults on [Puiatti] was that [he] wouldn't beat him to the point of drawing blood"; and (4) sometimes, while verbally abusing Puiatti, Mr. Puiatti

would "grab [Puiatti] by the shirt, place [his] fist under [Puiatti's] chin, and hold him." Mr. Puiatti abused Mrs. Puiatti, which caused Puiatti anguish.

Because he was "a hard working man," Mr. Puiatti did not have very much time to spend with his son during his childhood. Mr. Puiatti admitted that he "used to cheat the customers" of the various butcher shops and delicatessens that he worked at or owned, "to get a little extra money." Mr. Puiatti also "stole different products from the Westhampton Deli when [he] worked there" and then bragged about doing so in front of Puiatti. Because his son was heavily abusing drugs, Mr. Puiatti convinced Puiatti to join the military.

## C.    Affidavit and Testimony of Angela Wright

Wright, Puiatti's sister, described Mr. Puiatti's verbal abuse of Puiatti. Mr. Puiatti was "constantly harping on" Puiatti and criticizing him for not being more like Wright. Wright stated that: (1) both parents "beat both Carl and me to an extreme degree"; (2) "[t]hey beat us with a strap, wooden spoons, or anything else they could get their hands on"; (3) they broke "wooden spoons on Carl's back [and their] blows . . . left great welts on our bodies." This physical abuse caused Wright to leave home at age 16, although she returned a week later at the behest of her future husband, James Thatcher.

According to Wright, Mr. and Mrs. Puiatti also emotionally and physically abused Puiatti. Mr. Puiatti "used to constantly tell [Puiatti] he wasn't good

34

enough" and "call him a loser."  Most of the time, their father "would start yelling," and "grab his belt" and "proceed with Carl into his room and beat him."

Mr. Puiatti ran three meat markets and delicatessens in New York.  Wright and her then-husband, Jim Thatcher, worked for Mr. Puiatti.  Although Mr. Puiatti "was a good butcher and a good businessman," he cheated his customers.  Eventually, customers became aware of Mr. Puiatti's corrupt practices and business declined.  Mr. Puiatti closed two stores and asked Thatcher to take over the other one.  Wright and Thatcher purchased the store from Mr. Puiatti who told Wright that the business was $35,000 in debt.  After the sale, Wright learned that the business owed an additional $35,000 to a different creditor.

Mrs. Puiatti incurred significant credit card charges, but had no "intention of paying for anything and thought since they were moving [to Florida], there'd be no problem with not paying.

Wright stayed with Thatcher in New York when the family moved to Florida.  She "was told that [her] father was still punching [Puiatti] out in the garage."  After Puiatti joined the military, "[h]e went AWOL and came to visit [Wright and Thatcher] in Long Island," where he stayed until an uncle forced him to return to the military.

Wright described Mrs. Puiatti's practice of locking Wright and her siblings out of the family home while entertaining males.  Her mother and father frequently

35

argued and her mother had bruises and black eyes, possibly inflicted by her father. Her parents "portrayed themselves as being nice people" and "as being kind," when "in fact they were quite catty."

Trial counsel interviewed Wright and asked "how things were" in the Puiatti family, and Wright responded "that things were not as they seemed." Wright made this comment because she knew "that [her] parents . . . put on this front that they were so together. And [she] knew how fractured [her] family was." Wright did not elaborate on this comment because she was still in fear of her parents. Wright also did not tell trial counsel about the abuse that she personally suffered. Wright did provide some context for her "not as they seemed" comment. She told trial counsel that Mr. Puiatti was not a good businessman, he had financial difficulties in New York, and tried to come across as competent when in fact he was not.

## D.    Affidavit of James Thatcher

Wright's former husband, Thatcher, started dating Wright when he was 19, Wright was 16, and Puiatti was 12. Thatcher "got to know the whole family very well" and concluded that the Puiattis were "not a normal family, especially the parents, Linda and Victor." Thatcher observed welts on Wright's legs from Mr. Puiatti's regular beatings. Mr. Puiatti had a violent temper and "was very free with his hands." Mr. Puiatti verbally abused Puiatti by making "hurtful and harmful remarks" to Puiatti.

36

Mr. and Mrs. Puiatti "were very materialistic and lived in a different world, where things were as they thought they should be, not as they truly are." The Puiattis "put on airs to try to impress other people." Mr. Puiatti cheated customers and Puiatti "thought that by cheating he could get his father's approval."[8]

## E.    Affidavit of Joseph Puiatti

Puiatti's uncle, Joseph Puiatti, a police officer, lived in Medford, New Jersey and visited the Puiattis "fairly often" before they moved to Florida. He remembered Puiatti as a "good kid—very respectful, friendly, warm, and affectionate." Things took a turn for the worse for Puiatti after Mr. Puiatti persuaded him to join the military. In the Army, Puiatti was "thrown to the wolves." When Puiatti went AWOL and came to New York, Joseph Puiatti "immediately contacted his captain and reported [Puiatti's] whereabouts."

Before Puiatti returned to the military, Joseph Puiatti spent time with him and heard him describe his drug use. Puiatti started using drugs in junior high school, and in the military, he "was using lots of marijuana." Puiatti's "brain was like breakfast—scrambled eggs and burnt toast"; Puiatti "was one of the worst burned-out druggies [he] ever saw."

## F.    Affidavit of Betty Maniuzko

---

[8]Thatcher did not testify during Puiatti's trial, but he was present. There is no suggestion that Thatcher ever told trial counsel about abuse of Puiatti or his sister Angela Wright.

Betty Manizuko lived next door to the Puiatti family in New York and got to know the family well.  Manizuko witnessed Mr. and Mrs. Puiatti "punish [Puiatti] by beating him with a wooden spoon."  Manizuko knew Mrs. Puiatti "also used a wooden hanger."  Manizuko "never saw affection between the [Puiatti] children and their parents."

Mrs. Puiatti often "had men call on her during the day when [Mr. Puiatti] was at work" and "all the men around knew that if you wanted to have sex, [Mrs. Puiatti] was the person to see." While entertaining male visitors, Mrs. Puiatti locked her children out of the house, even when raining.

### G.    Affidavit of Dorothy Dennon

Dorothy Dennon, a New York resident, "knew . . . Puiatti when [she] taught second and third grades at Eagle Elementary School when [Puiatti] was a student there."  Puiatti was "a lost soul" who was "not a troublemaker but tended to be surrounded and dominated by the more powerful and strong boys."  Mr. Puiatti coached Puiatti's little league team but criticized and rejected him when he failed to make good plays.

### H.    Affidavit of Maureen Filippone

Maureen Filippone, the assistant principal at Puiatti's elementary school, stated that Puiatti "was never a troublemaker but he would have problems from attention-getting behavior."  Filippone "felt he didn't receive the warmth,

affection, and attention he needed at home so [he] acted out in these ways at school." Puiatti "was a troubled child . . . that . . . never received the help he needed."

## I.    Affidavit of Dr. Carol Swanson

Dr. Carol Swanson was a licensed and certified marriage and family counselor in Florida. After reviewing the record in Puiatti's case, Dr. Swanson diagnosed Puiatti as suffering from "pathological grief response," which she described as a "distorted and excruciatingly depressed state of mind." Puiatti became "a young man with virtually no sense of self esteem" suffering from intense depression because: (1) he lost parental love and approval; (2) "he was physically abused and consistently told he was 'no good'"; (3) he was "a failure at school and dropped out"; (4) "[h]is father 'forced' him to enter the army" where he failed "and dropped out"; (5) his "marriage was a failure"; (6) he lost his grandfather, Carl, . . . who was the most loving older person in his loveless world"; and (7) his son died without Puiatti being able to see him.

## J.    Testimony of Victor Puiatti, Jr.

Brother Victor Puiatti, Jr. ("Victor")[9] described Mr. Puiatti as a "strong, prideful, arrogant man" who dealt with his children "very extremely sternly." Mrs.

---

[9]Victor is ten years younger than Puiatti. At the time of Puiatti's 1983 trial, Victor was approximately 10-years-old.

Puiatti also hit Victor and his siblings, using her hands and wooden spoons.  Mr. Puiatti struck Victor once or twice per week, and Mrs. Puiatti struck him only once every two weeks.

Usually, these beatings occurred with only minimal provocation.  Victor lived in constant fear of being abused by his father.  When Victor was 16, Mr. Puiatti punched him in the face after Victor took the family car and stayed out too late.  Victor overheard the altercation between his father and Puiatti that occurred shortly before Ritchie's murder.  Victor could hear "outside through the closed door this—the banging of bodies getting into an altercation and my dad yelling and he's cursing Carl . . . . He had to have been beating the crap out of him."  He heard Puiatti say in response, "no, Dad, no.  Stop, stop.  Okay.  Okay.  I'm sorry.  I'm sorry."

### K.    Testimony of Dr. Sally Karioth

Dr. Sally Karioth, a college professor and a licensed traumatologist, was qualified as an expert in the areas of grief and trauma.  After reviewing Puiatti's case in 1990, Dr. Karioth diagnosed Puiatti as suffering from "bereavement overload" when he murdered Ritchie.  Dr. Karioth described this condition as occurring "when someone has a loss" and is unable to address that loss in a healthy manner because the person "live[s] in an environment where [he is] fearful or where there's abuse."  As a result, the person will "feel powerless in the

40

environment [he is] in, so [he] will try to do something that makes [him] feel powerful.  [He will] ask for punishment because . . . [he] think[s] he deserve[s] it."

Dr. Karioth testified that, before Ritchie's murder, Puiatti endured several grief-causing episodes including loss of his child, his grandfather's death, and failure of his marriage, which caused him to "plummet into a great sadness, a great moroseness."

## L.    Testimony of Dr. Jacquelyn Olander

Dr. Jacquelyn Olander, a psychologist, testified as an expert in neuropsychology.  In 2012, Dr. Olander performed a day-long forensic neuropsychological evaluation of Puiatti.  Dr. Olander reviewed affidavits, court findings, Puiatti's personal records, and the trial testimony of Drs. Meadows and DelBeato.

Dr. Olander administered a number of tests, including the Wechsler Adult Intelligence Scale-4 ("WAIS-4").[10]  This test revealed what Dr. Olander described as a "significant difference between [Puiatti's] right and left brain functioning." Specifically, Dr. Olander discovered: (1) Puiatti's left brain function (or "verbal IQ") "was in the average range"; (2) his right brain function (or "nonverbal processing") "was in the mildly impaired range"; (3) "[h]is working memory was

---

[10]Dr. Olander described the WAIS-4 as follows:  "The WAIS-4 is a measure of one's overall intellectual functioning.  It looks at what is described as left brain functioning or similarly known as verbal IQ, right brain functioning, formally known as performance IQ, working memory and general processing speed."

41

normal or above average"; and (4) "his processing speed was in the normal range." Dr. Olander suggested that the difference in verbal and nonverbal abilities (or left and right brain functioning) indicated "the presence of a cognitive disorder." Dr. Olander stated that Puiatti's cognitive impairments might have been caused by: (1) substance abuse, dating to an early age; or (2) two concussions that he experienced.[11]

Dr. Olander also administered the Delis Kaplan Executive Function System test, which tests a brain's operating system, essential for abstract reasoning and higher level thinking skills. That test revealed impairments in Puiatti's executive functioning. Additionally, Dr. Olander gave Puiatti a Wechsler Memory Scale test, which measured Puiatti's verbal and nonverbal immediate and delayed recall memory. Although the WAIS-4 revealed that Puiatti's memory was "normal or above average," Puiatti's scores on the Memory Scale "fell within the impaired to below average range."

During her 2012 evaluation, Puiatti told Dr. Olander about "a significant history of abuse by both parents that was unpredictable, that was severe in its occurrence, that [was] severe and chronic and pervasive from both parents." In Dr. Olander's opinion, this history of abuse was also evident because: (1) non-family

---

[11]Dr. Olander formally diagnosed Puiatti as suffering from "polysubstance dependence disorder in remission in a controlled environment, dysthymic disorder . . . . chronic mild depression[,] . . . [and a] personality disorder characterized by dependent passive borderline traits."

members described Puiatti "as an emotionally sad child who had significant emotional problems"; (2) "[h]is teachers, principals at school described him as a passive follower, not a leader, who presented as a child with significant emotional problems"; and (3) "[h]is history of using drugs on a regular basis dating back to middle school as a coping mechanism for self medication is consistent with a child who's experienced such abuse."

It did not surprise Dr. Olander that Mr. and Mrs. Puiatti concealed their child abuse from trial counsel. Dr. Olander's review of the record established that the Puiattis were "a family who prioritized the need [to] keep that image as the perfect family" and "the needs of . . . Puiatti as a child were certainly secondary to the needs of the family and the needs of the parents." Dr. Olander identified four "red flags" that would have caused her to suspect child abuse: (1) Puiatti's life history statement that his parents usually did not punish him "without reason"; (2) Puiatti twice moved back into his parents' home as an adult, once after leaving the military, and again after leaving his wife, which is common behavior for a child abuse victim; (3) Puiatti's addiction to drugs; and (4) Puiatti was easily manipulated.

## M.    Testimony of Dr. Michael Greenberg

Dr. Michael Greenberg, a licensed psychologist, also testified as an expert in psychology and child abuse. For a 2005 psychological evaluation of Puiatti, Dr.

43

Greenberg reviewed affidavits about Puiatti's childhood and abusive parents, Puiatti's educational and mental health documents, and findings of mental health experts, including Drs. Meadows and DelBeato. Dr. Greenberg also conducted a clinical interview of Puiatti, administered an IQ test, and performed a "mental status examination."

Dr. Greenberg concluded that Puiatti was not mentally retarded but did suffer a history of child abuse. After reading Mr. and Mrs. Puiatti's affidavits where they admitted to abusing Puiatti, Dr. Greenberg asked Puiatti about this abuse. There were other aspects of Puiatti's history, however, that Dr. Greenberg said would have caused him to suspect abuse even without the parents' admissions, including that: (1) Puiatti failed to complete high school; (2) he abused drugs from an early age; (3) he divorced his wife; (4) he used drugs while in the military; (5) he was discharged from the military; and (6) he previously committed criminal offenses.

Dr. Greenberg testified that Puiatti's case was worse than other cases due to "the chronic nature of the abuse, the severity of the abuse and the unpredictable nature of the abuse." According to Dr. Greenberg, the child abuse Puiatti suffered was "the most important origin of his . . . ultimate dissent to criminal behavior and makeup of his personality."

44

On cross-examination, Dr. Greenberg admitted that: (1) Puiatti scored very highly on the MPI-2 test, which tests an individual's "psychopathic deviant" score; (2) individuals who score highly on the MPI-2 often have characteristics that may not be beneficial to society; and (3) Puiatti exhibited many characteristics common among high scorers on the MPI-2 test.  The State showed Dr. Greenberg copies of a sentencing report and a judgment of conviction showing that Puiatti had committed a robbery, kidnapping, and attempted murder the very day before he murdered Ritchie.  Dr. Greenberg acknowledged that Puiatti's kidnapping conduct recounted in these documents was "consistent with [his] findings of antisocial traits."

## N.     District Court's 2012 Order

On August 24, 2012, the district court issued a 61-page order denying all of Puiatti's claims, including his ineffective counsel claim.  Concluding that Garrett did not render ineffective assistance, the district court found that "the record simply belies Puiatti's contention that Garrett unreasonably failed to investigate her client's background."  The district court found that Puiatti himself "denied that he was abused and portrayed his family life as positive in the personal history he provided to Garrett."  At a minimum, Puiatti never mentioned any child abuse to Garrett and "gave the impression that his family life was stable and loving."  The district court also found that Puiatti and his family not only "made no mention

45

whatsoever of abuse" but also "in fact led [Garrett] to believe that the Puiatti home was normal." The district court further found that Drs. Meadows and DelBeato did not uncover potential abuse.

The district court recounted trial counsel's extensive investigation of Puiatti's family, school, and mental health background, and found telling that, despite all of this work, "[n]othing indicated that Puiatti had been abused." Accordingly, trial counsel had justifiably "decided to pursue a strategy whereby she would portray Puiatti as a young man from a good family caught up in the murder of Mrs. Ritchie solely because of his association with Robert Glock, his dominant, more experienced co-defendant."

The district court also held that Puiatti had not established prejudice for multiple reasons. First, the jury voted 11-to-1 in favor of a death sentence, and the sentencing court found three aggravating factors warranting a death sentence and no mitigating factors.

Second, the district court found that more mental health and child abuse evidence in Puiatti's case would not have established statutory mitigating factors, such as acting under extreme mental or emotional disturbance or a lack of capacity to appreciate the criminality of one's actions, because "this murder was not committed on a whim" and "[i]nstead . . . Puiatti exhibited goal-oriented behavior" by driving to a mall, waiting for a victim, selecting a vulnerable female, forcing her

46

into the car, robbing her, demanding cash, and then taking her 80 miles to an isolated location to kill her.  The district court found that, even in light of the child abuse evidence, "[t]he facts of this cold, deliberate murder simply clash with the mental health mitigation circumstances of extreme or emotional disturbance or lack of capacity to appreciate the criminality of one's action."

Third, Puiatti's new child abuse evidence would have opened the door to evidence from the State that would have "rendered nugatory" "any positive effect from the new evidence."  For example, Dr. Greenberg's testimony presented by Puiatti, elicited the State's cross-examination regarding a violent kidnapping and robbery Puiatti and Glock committed on the very day before they kidnapped, robbed, and murdered Ritchie.  Additionally, Dr. Greenberg admitted that Puiatti "was a 'high scorer' on the so-called psychopathic deviant scale, another fact that would have augured against the judge or jury's sparing Puiatti's life."

Fourth, even if trial counsel introduced child abuse evidence, and even if the jury and trial judge considered it mitigating, that child abuse evidence, together with all other mitigation evidence, would not have overcome a death sentence. "Given the overwhelming evidence of Puiatti's guilt and the wanton, depraved approach to humanity evinced by his conduct, the result in this case would have been the same."

## VIII.  STANDARDS OF REVIEW

47

Because Puiatti filed his § 2254 petition before the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we review his claims under pre-AEDPA law.  Turner v. Crosby, 339 F.3d 1247, 1273 (11th Cir. 2003).  "Under pre-AEDPA standards, [a] state court's factual determinations that are reasonably based on the record are presumptively correct . . . .  We review state court determinations of law de novo."  Thompson v. Haley, 255 F.3d 1292, 1295 (11th Cir. 2001).

Also "[u]nder pre-AEDPA law, this Court reviews de novo the district court's denial of [Puiatti's] § 2254 petition and the court's subsidiary legal conclusions.  The district court's findings of fact, however, are subject to review under the clearly erroneous standard."  Turner, 339 F.3d at 1273 (internal citations omitted).  Any factual findings made by the district court are reviewed for clear error, but its legal conclusions and mixed questions of law and fact are reviewed de novo.  Id.

## IX. INEFFECTIVE ASSISTANCE OF COUNSEL IN PENALTY PHASE

### A. Strickland Standard

Puiatti's ineffective assistance of counsel claim is governed by the Supreme Court's two-pronged test announced in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  See Pooler v. Sec'y, Fla. Dep't of Corrs., 702 F.3d 1252, 1269 (11th Cir. 2012).  Under Strickland, to establish constitutionally ineffective

counsel, a defendant must show that (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. We first consider the performance prong, discussing trial counsel's pre-trial investigation, her work with the expert witnesses, and Puiatti's suggestion that his trial attorney ignored "red flags" of child abuse.

## B.    Performance Prong Principles

The Strickland performance standard is "objectively reasonable attorney conduct under prevailing professional norms." Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010); see Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). We look at what professional norms existed at the time that the attorney acted. See Johnson v. Sec'y, DOC, 643 F.3d 907, 931 (11th Cir. 2011). The question is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. A petitioner bears the burden of proving, "by a preponderance of competent evidence, that counsel's performance was unreasonable." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); accord Harrington v. Richter, 562 U.S. —, 131 S. Ct. 770, 790 (2011) ("Strickland . . . calls for an

49

inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

In answering this question, even pre-AEDPA, we are mindful that "[t]rial counsel's performance is entitled to 'highly deferential' judicial scrutiny." Turner, 339 F.3d at 1275 (internal quotation marks omitted); see also Bolender v. Singletary, 16 F.3d 1547, 1557 (11th Cir. 1994) ("It is important to note that judicial scrutiny of an attorney's performance is appropriately highly deferential . . . ."). We therefore, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Turner, 339 F.3d at 1275 (internal quotation marks omitted). "For a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315.

Under the professional standards in place in 1983 and 1984, when trial counsel represented Puiatti, a defense attorney in a capital case had a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and to present at sentencing mitigating evidence uncovered during that investigation. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; see also Williams v. Taylor, 529 U.S. 362, 395–98, 120 S. Ct. 1495, 1514–15 (2000) (counsel's performance was deficient because counsel "did not

50

fulfill their obligation to conduct a thorough investigation of the defendant's background"); Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1351–52 (11th Cir. 2011) (observing that counsel had an obligation to conduct "an adequate background investigation"); Johnson, 643 F.3d at 931 ("The Supreme Court has held that based on standards applicable in 1980 . . . an attorney representing a capital defendant has an obligation to conduct a thorough investigation of the defendant's background."). An attorney's strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id., 104 S. Ct. at 2066.

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527, 123 S. Ct. 2527, 2538 (2003). Of course, "a complete failure to investigate may constitute deficient performance of counsel." Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 787 (11th Cir. 2003); see also Housel v. Head, 238 F.3d 1289, 1294 (11th Cir. 2001) (explaining that "a

51

failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history").

That said, "no absolute duty exists to investigate particular facts or a certain line of defense." Chandler, 218 F.3d at 1318. Instead, a court's assessment of an attorney's investigation hinges on whether that investigation—or the decision to limit it—was reasonable. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. Finally, "[a] decision to limit investigation is 'accorded a strong presumption of reasonableness,'" Mills v. Singletary, 63 F.3d 999, 1021 (11th Cir. 1995) (internal quotation marks omitted), and "to be effective a lawyer is not required to 'pursue every path until it bears fruit or until all hope withers.'" Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) (quoting Foster v. Dugger, 823 F.2d 402, 405 (11th Cir. 1987)).

Although we must assess a decision not to investigate "for reasonableness in all of the circumstances," when doing so we apply "a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066. We keep in mind that a defense attorney "preparing for the sentencing phase of a capital trial," is not required "to scour the globe on the off chance something will turn up." Rompilla v. Beard, 545 U.S. 374, 383, 125 S. Ct. 2456, 2463 (2005). Rather, "reasonably diligent counsel may draw a line when they have good reason to think that further investigation would be a waste." Id., 125 S. Ct. at 2463.

## C.    Performance of Puiatti's Trial Counsel

After considerable review of the record and under the particular circumstances of this case, we conclude that the district court properly concluded that trial counsel conducted a reasonable investigation of Puiatti's background and developed a penalty phase mitigation strategy supported by the evidence her investigation produced. Although that strategy did not yield the outcome that counsel and her client desired, it was nevertheless a reasonable one to pursue and her performance was not ineffective.

During her investigation, trial counsel, among other tasks: (1) met with Puiatti several times and explained to him the nature of mitigating evidence and the importance of developing a comprehensive picture of his background; (2) directed Puiatti to write a history of his life; (3) interviewed Mr. and Mrs. Puiatti on multiple occasions, advised them about the nature of aggravating and mitigating circumstances, and even visited the Puiatti family home; (4) interviewed sister Wright and advised Wright about the importance of gathering all information possible about Puiatti's background; (5) interviewed Puiatti's former wife; and (6) spoke on the telephone with Puiatti's uncle, Joseph Puiatti.

In addition to meeting with Puiatti's family members, trial counsel solicited and received numerous records of Puiatti's life, including school, hospital, military, and jail records. Counsel also sent a letter to Puiatti's high school

53

guidance counselor, seeking to identify individuals in New York who may have known Puiatti when he was a child and had relevant background information about Puiatti's childhood.  In seeking records, trial counsel was "just trying to get all the records [she] could think of that might document independently [Puiatti's] situation and his life and see what they might reveal."

Trial counsel not only personally completed these investigative tasks but also hired an investigator to help her.  She also hired two mental health experts and instructed at least one of them to conduct his own independent investigation of Puiatti's background, which that expert did by interviewing Puiatti and his parents too.

In short, trial counsel's investigation was comprehensive and thorough.  We have previously determined that an attorney performed a reasonable investigation of his client's background after the attorney performed only some of the actions that Garrett performed.  See, e.g., DeYoung v. Schofield, 609 F.3d 1260, 1285 (11th Cir. 2010) (attorneys interviewed members of petitioner's family and an investigator subpoenaed petitioner's school and work records); Housel, 238 F.3d at 1295 (attorney instructed petitioner to "prepare a life history to help with the investigation" and contacted petitioner's family members).

After completing her investigation, trial counsel decided to present a mitigation strategy that centered on Puiatti's having come from a good family who

stood willing to assist him in his rehabilitation, as well as Puiatti's history of drug abuse, the major traumas and disappointments he had endured, his brain damage, and the fact that he was not prone to violence. Because trial counsel made this decision after a thorough investigation of Puiatti's background, we consider her decision "virtually unchallengeable." Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066.

Trial counsel's chosen mitigation strategy was also a reasonable one given the evidence, recounted above, that she did uncover. During the penalty phase hearing, Mrs. Puiatti testified about how much she and her husband cared for Puiatti. Specifically, she talked about how they had obtained counseling for their son when he started to abuse drugs, allowed Puiatti to live with them as an adult after he suffered repeated setbacks, and sought to obtain help for Puiatti when his drug problems did not abate during adulthood. Furthermore, Dr. Meadows independently confirmed that Puiatti came from a good family that "imbued [him] with a rather strong moral code."

Indeed, trial counsel reasonably chose her mitigation strategy based primarily on the information that she received from Puiatti, his family members, and two mental health experts. Puiatti told counsel he came from a good family and he never wanted for anything. Puiatti told the sentencing judge he came from a "good and crime-free" family. In all of the interviews defense counsel conducted

of Puiatti and his family members, no one ever disclosed the pattern of systemic child abuse endured by Puiatti, which came to light only years after Puiatti was sentenced.

We have repeatedly held that "[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him." Williams, 185 F.3d at 1237; see also DeYoung, 609 F.3d at 1287–88 (holding that counsel's investigation was reasonable in light of the fact that there was "no evidence that DeYoung mentioned to his trial or appellate counsel or to any mental health experts (before trial or even afterward) . . . that there was significant internal strife or dysfunction in his family"); Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) (noting that "[b]ecause information about childhood abuse supplied by a defendant is extremely important in determining reasonable performance, '[w]hen a petitioner . . . does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation'" (alterations in original) (additional internal quotation marks omitted)); Stewart v. Sec'y , Dep't of Corrs., 476 F.3d 1193, 1210–11 (11th Cir. 2007) ("The Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse."). A lawyer is also not ineffective when the "family members petitioner directs his lawyer to talk to . . . do not

56

mention a history of physical abuse." Van Poyck. v. Fla. Dep't of Corr., 290 F.3d 1318, 1325 (11th Cir. 2002).

Although Puiatti relies on Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), that decision is wholly different. The record showed "that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration . . . , and then, after his parents were released from prison, had been returned to his parents' custody." Id. at 395, 120 S. Ct. at 1514 (footnote omitted). In Williams, "counsel did not begin to prepare for [the penalty phase] of the proceeding until a week before the trial." Id. at 395, 120 S. Ct. at 1514. During their preparation, Williams's attorneys did not merely conduct an inadequate background investigation, "[t]hey failed to conduct an investigation" at all. Id., 120 S. Ct. at 1514. Nevertheless, evidence of Williams's "nightmarish childhood" was readily available in state records, which counsel erroneously believed they could not access. Id., 120 S. Ct. at 1514.

Unlike the attorneys in Williams, the record here shows that: (1) Puiatti's attorney began preparing for the penalty phase well in advance of the trial; (2) counsel conducted a thorough investigation of Puiatti's background; (3) the evidence of Puiatti's childhood abuse was not readily attainable in state records;

57

(4) Puiatti told his counsel he came from a loving and supportive family; and (5) in fact, the child abuse was concealed from Puiatti's attorney by both Puiatti and his family members. If anything, the differences between this case and Williams support the district court's denial of Puiatti's ineffective counsel claim here.

The decision in Wiggins v. Smith is also instructive. There, trial counsel stopped their investigation of Wiggins's background upon receiving: (1) a one-page presentence investigation report ("PSI") that noted Wiggins's "misery as a youth"; and (2) Department of Social Services ("DSS") records of Wiggins's various placements in foster care. Wiggins, 539 U.S. at 523–24, 123 S. Ct. at 2536 (internal quotation marks omitted). The DSS records actually revealed that Wiggins's "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." Id. at 525, 123 S. Ct. at 2537. Despite having these records, counsel did not discover or present mitigating evidence regarding severe physical and sexual abuse petitioner suffered at the hands of his mother and while in the care of a series of foster parents. Id. at 516–17, 123 S. Ct. at 2532–33. Counsel did not offer expert testimony about Wiggins's background and mental composition in light of this abuse. Id. at 516, 123 S. Ct. at 2532. Given the known information, it was "[c]ounsel's decision not to expand

58

their investigation beyond the PSI and the DSS records [that] fell short of the professional standards that prevailed [at the time]." Id. at 524, 123 S. Ct. at 2536.

In comparison here, Puiatti's attorney did not receive any document that suggested that Puiatti was abused as a child. To the contrary, Puiatti affirmatively told trial counsel that his family loved and supported him, and family members confirmed that this was true. Puiatti's attorney retained two expert witnesses, both of whom testified about Puiatti's loving and supportive family. No expert reported child abuse. The known evidence here would not have led a reasonable attorney to investigate further.

Rompilla v. Beard also does not help Puiatti. The attorneys in Rompilla had easy access to Rompilla's prior conviction file, a public document stored at the courthouse where Rompilla was to be tried, which showed that "Rompilla was reared in the slum environment of Allentown, Pa. vicinity. He early came to the attention of juvenile authorities, quit school at 16, and started a series of incarcerations." 545 U.S. at 384, 390–91, 125 S. Ct. at 2464, 2468 (internal quotation marks and alterations omitted). Rompilla's attorneys failed to examine the prior conviction file, despite knowing that the prosecution intended to seek the death penalty by attempting to establish that "Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law." Id. at 383, 125 S. Ct. at 2464. The Supreme Court concluded that,

59

because Rompilla's attorneys actually knew that "[t]he prosecution was going to use the dramatic facts of a prior offense," they "had a duty to make all reasonable efforts to learn what they could about the offense." Id. at 385, 125 S. Ct. at 2465.

Unlike in Rompilla, Puiatti's trial attorneys did not fail to obtain documents that were easily accessible. Notably, nothing in this record suggests that there was any existing document in 1984 that recounted the child abuse Puiatti suffered, much less that it was easily accessible at the courthouse. In fact, after interviewing Puiatti, his family members, and two mental health professionals, trial counsel went to great lengths to obtain documents relating to Puiatti's background and none of them reported any child abuse. If anything, Rompilla shows that Puiatti's claim fails.

We recognize that Puiatti relies on Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011), where Ferrell and his family members (his parents and his brother) did not disclose Ferrell's abusive upbringing to his trial attorneys. Id. at 1230. The pivotal fact there though was that Ferrell's attorneys conducted only a "limited character investigation—which asked, essentially, only whether Ferrell was trustworthy and had a good reputation." Id. at 1231. And they did not investigate or ask questions about Ferrell's childhood background. Id. at 1230. Counsel would have discovered helpful evidence of childhood abuse "had [they] only asked these witnesses about the defendant's background and childhood." Id.

60

Unlike the attorneys in <u>Ferrell</u>, Puiatti's attorney did not conduct only a "limited character investigation."  <u>See</u> <u>id.</u> at 1231.  Rather, Garrett explained to Puiatti and his family members the nature of mitigating evidence, and stressed to them the importance of developing a complete picture of Puiatti's childhood, background, and family history.  Counsel's shortcoming in <u>Ferrell</u> was their general failure to ask any questions about Ferrell's "background and childhood." <u>Id.</u> at 1230.  Here, Puiatti's trial attorney did ask those questions.  The facts here— Puiatti and his family members concealed the child abuse and that Garrett received misleading answers—do not negate the adequacy of Garrett's investigation.[12]

We also reject Puiatti's contentions regarding James Thatcher, Wright's former husband.  Puiatti's brief alleges that: "Garrett was explicitly told that Thatcher would have critical information about Puiatti, a fact that Garrett emphasized in her notes with an asterisk."  The record, however, does not support this allegation.  It is true that Garrett's notes contained a reference to Wright and "Jimmy," which Garrett assumed referred to James Thatcher.  And, there was an asterisk next to the reference to "Angela and Jimmy."  But when Puiatti's habeas

---

[12]In <u>Cooper v. Secretary, Department of Corrections</u>, 646 F.3d 1328 (11th Cir. 2011), counsel interviewed only the petitioner and his mother, who did not disclose the abuse inflicted by Cooper's father and brother.  Counsel offered no excuse for not speaking with those family members.  <u>Id.</u> at 1352.  In any event, Cooper's attorneys, in fact, uncovered the evidence of Cooper's childhood abuse from the deposition of a clinical psychologist who evaluated Cooper. <u>Id.</u> at 1340, 1352.  The attorneys, for strategic reasons, decided not to call the psychologist to testify.  <u>Id.</u> at 1352.  Unlike in <u>Cooper</u>, Puiatti's counsel did speak with his siblings, other family members, and the two mental health experts, and Garrett never learned about child abuse.

attorney asked Garrett why there was an asterisk, Garrett responded: "I can't be a hundred percent sure. Now, when I'm making notes like this I make an asterisk if it's something I have to do. It's my reminder when I look through the notes later I've got to do something about that." Garrett then added: "So, I don't know—I can't recall now if that was my practice back then or if it was just something to—it was something to draw attention to that. I was making that asterisk to draw attention to it in some fashion." There is nothing in Garrett's notes or her testimony about Thatcher having "critical information about Puiatti," much less that her asterisk emphasized that. More importantly, Strickland requires that we make "every effort . . . to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S. Ct. at 2065. Counsel had already interviewed Wright, Thatcher's wife, and could have reasonably concluded that any information Thatcher could provide would be derivative of Wright's (as Puiatti's sister) first-hand perspective on the Puiatti family. See Williams, 185 F.3d at 1238 (noting that the § 2254 petitioner's trial attorney's failure to interview Williams's sister and father did not make her investigation constitutionally inadequate, regardless of whether it "would have been better if [the attorney] had . . . interviewed" these individuals).[13]

_____

[13]Puiatti also criticizes his trial attorney for not contacting Puiatti's childhood neighbors in New York, but trial counsel did attempt to locate individuals who knew Puiatti as a child in New York by sending a letter to Puiatti's guidance counselor. To the extent that Puiatti wishes

Puiatti further contends that trial counsel ignored "red flags" of child abuse. Puiatti's alleged "red flags" are either not actually suggestive of child abuse, or are not suggestive absent the beneficial lens of hindsight.

For example, Puiatti claims that Wright's statement that things were "not as they seemed" or that her parents painted a "rosy picture" which was "not so," should have caused trial counsel to suspect that Mr. and Mrs. Puiatti physically and verbally abused their children. This argument wholly ignores that Wright actually provided ample context for what her statement meant, none of which had anything to do with child abuse. Wright told Puiatti's attorney that: (1) Mr. Puiatti was a corrupt and incompetent businessman; (2) Puiatti received very little affection from his father; (3) Mrs. Puiatti often could not pay her bills and tried to avoid debt collectors; and (4) when Wright encountered Puiatti after he committed the crimes, Puiatti showed little remorse. Thus, trial counsel reasonably could have concluded that Wright had thoroughly explained the reasons for her comment and that additional follow-up inquiries were unnecessary.[14] And although these statements suggested that the Puiatti family had its troubles, they would not have caused a

that his trial attorney had done more to track down New York witnesses, counsel "did not have endless time, energy, or financial resources." See Williams, 185 F.3d at 1237.

[14]Moreover, Wright's statements at the evidentiary hearing cast doubt as to whether, even if Puiatti's attorney had specifically asked about child abuse, Wright would have been forthcoming with details of Puiatti's claimed abuse. Wright testified that, during this conversation, she "was still in fear of [her] parents because they were around so [she] wasn't able to say what [she] really wanted to tell them about the abuse that [Puiatti] and [she] had suffered."

reasonable attorney to believe that Puiatti was physically abused by his own parents, especially given that Puiatti himself said he came from a loving and supportive family.

Puiatti also argues that the basic fact that he abused substances on a daily basis beginning at the early age of 13 should have alerted counsel that Puiatti was abused by his parents, but, as the district court observed "[t]here are innumerable reasons why certain individuals develop addictions to drugs." Although Puiatti's experts, Drs. Olander and Greenberg testified that there was likely a link between Puiatti's drug abuse and his experiences of childhood abuse, these experts did not discover the child abuse by way of the drug abuse. Rather, Puiatti told them about being abused as a child, and then they linked that physical abuse to Puiatti's struggles with drugs. In 1984, trial counsel and the trial experts did not enjoy the same benefit of Puiatti's candor. Trial counsel cannot be faulted for failing to link Puiatti's history of drug abuse with an otherwise-undisclosed history of child abuse.

Puiatti stresses Dr. Meadows's statement to trial counsel that Mrs. Puiatti sometimes "broke spoons" when disciplining her children. Importantly, this statement did not cause Dr. Meadows, an experienced mental health professional, to diagnose or even suspect a history of child abuse. As the district court stated, "[i]t strains credulity to think that not only was trial counsel ineffective as an

64

attorney in investigating Puiatti's background in 1984, but so too were Drs. Meadow[s] and DelBeato incompetent and unable to evoke pivotal information regarding Puiatti's allegedly abusive childhood."

Puiatti also argues that his altercation with Mr. Puiatti shortly before the murder should have caused trial counsel to suspect child abuse. This altercation, however, did not occur when Puiatti was a child. Rather, it occurred in the months preceding Puiatti's 1983 crimes, after Puiatti was married, served in the military, and moved back to the family home and developed depression due to the death of his infant son. As Mr. and Mrs. Puiatti both testified, the altercation was the result of Puiatti's living in the family home, his father suspecting drug usage, and Puiatti having a negative attitude. We do not believe that this isolated altercation between two adults (that did not actually result in physical violence beyond shoving) during an emotionally charged period of both adults' lives should have suggested to trial counsel a history of child abuse.

Puiatti's last supposed "red flag" is Puiatti's handwritten life history, specifically Puiatti's express statement that his parents did not punish him "without reason." Puiatti contends that this statement "and its placement in the life history should have signaled a larger underlying problem of abuse." But Puiatti's statement did not describe what the "punishment" was, much less hint at child abuse. This is especially so, given various other statements in Puiatti's life history

65

discounted any suggestion of child abuse, including his statements that: (1) his "childhood was pretty normal"; (2) his parents "insisted [he] go see a counselor" about his substance abuse; and (3) he "never wanted for anything."[15]

Thus, for all of the reasons explained and considered together, Garrett's investigation and presentation of mitigation evidence was not deficient and Puiatti has not established unreasonable performance of counsel.

## D.    Prejudice Prong Principles

Even if we were to conclude that trial counsel's pre-trial investigation and presentation of mitigation evidence were ineffective assistance, we still deny the petition because Puiatti has not carried his burden to establish prejudice.

For prejudice, the standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Rose v. McNeil, 634 F.3d 1224, 1241 (11th Cir.), cert. denied, 132 S. Ct. 190 (2011) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).  To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable." Harrington, 562 U.S. at —, 131 S. Ct. at 792.  "Counsel's

---

[15]Finally, we reject Puiatti's contention that trial counsel "misdirected the expert witnesses," and prevented Drs. Meadows and DelBeato from independently uncovering evidence of child abuse.  The record fully establishes that this was not the case.  Additionally, as the district court aptly observed, "the pivotal difference between the examinations by Drs. Meadows and DelBeato in 1984 and the examinations by Drs. Greenberg and Olander in advance of the 2012 evidentiary hearing [in the § 2254 case] is that, while Puiatti concealed or otherwise failed to mention his allegedly abusive upbringing during the 1984 examinations, he freely offered details of abuse during the 2012 examinations."

errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 787–88 (quotation marks and citation omitted).

Because Puiatti alleges ineffective assistance in the penalty phase, he must show that "there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Rose, 634 F.3d at 1241–42 (internal quotation marks and citation omitted). In assessing prejudice, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (internal quotation marks and brackets omitted); see also Wong v. Belmontes, 558 U.S. 15, 26, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice.").

### E.    Puiatti's Prejudice Claim

Puiatti's prejudice claim fails for several reasons. First, even accepting the new child abuse evidence as true, it is not certain or even likely that this evidence would have caused the jury to make a different recommendation or the state trial court in Puiatti's case to find a statutory or non-statutory mitigating circumstance at all. It is undisputed that Puiatti's childhood was not depraved and impoverished. We do recognize, however, that Puiatti presented evidence that he was: (1)

67

physically abused by his father and mother, sometimes with objects like wooden spoons, and sometimes without provocation; (2) verbally abused by his father, who compared him negatively to his sister; (3) worked with his father and observed his father cheat customers; and (4) had a mother who was abused by Puiatti's father and let men inside the family home, while locking her children outside in the rain. Nevertheless, Puiatti came from a working class family who made various attempts to support him. For example, Puiatti's parents obtained counseling for him when he developed a drug problem. They allowed him to return home after he left the military. When Puiatti entered into a marriage, against his mother's advice, Mrs. Puiatti did all she could to support the young couple.[16]

Of course, childhood abuse evidence can be mitigating during a capital sentencing proceeding. See, e.g., Wiggins, 539 U.S. at 516–17, 123 S. Ct. at 2523–33; Ferrell, 640 F.3d at 1239–41. Although Puiatti's childhood was far from ideal, the record does not establish that the jury or the state trial court here would have necessarily found it a mitigating factor or a strong one at that.

Second, even if we assume that Puiatti's new evidence would have established a mitigating factor, we conclude that there is no reasonable probability

[16]The possibility that the sentencing court might not have found the type of child abuse evidence in Puiatti's case to be a mitigating factor is enhanced here by the fact that the same court heard a wealth of good family and potential rehabilitation evidence but did not find a non-statutory mitigating circumstance based on that evidence actually presented, although that evidence was at least as compelling as the child abuse evidence Puiatti wishes counsel had presented.

that the state trial judge would have found that this mitigating evidence outweighed the undisputed aggravating circumstances. There is no dispute that, even if trial counsel had presented the evidence of child abuse, the trial court would have still found the three aggravating circumstances: (1) that Puiatti's offense was committed during flight or to avoid arrest; (2) that it was committed for pecuniary gain; and (3) that it was committed in a "cold, calculated, and premeditated manner."

The trial court gave significant weight to the "cold, calculated, and premeditated" circumstance. In its post-sentencing statement of reasons, the trial court stated: "[i]t would be difficult to imagine a more cold, calculated or premeditated killing." And the "cold, calculated, and premeditated" aggravator is one of "the most serious aggravators set out in the statutory sentencing scheme." Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1300 (11th Cir. 2012) (citing Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999)).

This Court has previously determined in cases like this one involving brutal murders where a sentencing court found three aggravating factors, that new mitigating evidence did not create a "reasonable probability" of a different outcome. See Wood v. Allen, 542 F.3d 1281, 1313 (11th Cir. 2008); Callahan v. Campbell, 427 F.3d 897, 938 (11th Cir. 2005). In Wood, this Court rejected the § 2254 petitioner's claim that evidence of his limited mental capacity would have

69

led to a reasonable probability of a different outcome, when the sentencing judge stated that the three aggravating factors "far outweighed the mitigating circumstances in all regards." Wood, 542 F.3d at 1313 (internal quotation marks and alterations omitted).[17] Likewise, in Callahan, we held that a § 2254 petitioner did not establish prejudice based on counsel's failure to offer mitigating evidence of child abuse when the sentencing court found three aggravating factors and there was "overwhelming evidence" that Callahan had "kidnapped, raped and murdered" his victim. Callahan, 427 F.3d at 938.[18] We noted "the burden a defendant faces when trying to overcome . . . harsh aggravating factors with mitigating evidence." Id. The conclusion that Puiatti cannot overcome this burden is even stronger here than in Wood or Callahan, as those cases did not involve a finding of a "cold, calculated, and premeditated" circumstance (or a similar factor) like the trial court found in this case.[19]

---

[17]In Wood, the three aggravating factors the Alabama trial court found were: "(1) Wood murdered [the victim] during a burglary; (2) Wood had a prior violent felony conviction; and (3) Wood murdered [the victim] while on parole." Wood, 542 F.3d at 1313.

[18]In Callahan, the Alabama trial court found the following aggravating factors: (1) "the crime was committed while Callahan was under sentence of imprisonment"; (2) "the defendant had previously been convicted of a crime of violence"; and (3) "the murder was committed during a kidnapping." Callahan, 427 F.3d at 938.

[19]Although Callahan and Wood both involved Alabama's death penalty statute, we note that the Alabama courts in those cases could have found, but did not, the following aggravating circumstance: "The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." Ala. Code 13A-5-49(8).

70

There is more though.  If we remanded this case for a new penalty trial, the sentencing court might find not just three aggravating circumstances, but others.  In 1984, the State agreed not to introduce evidence about the crimes Puiatti committed the day before he killed Ritchie, which resulted in convictions for attempted first degree murder, kidnapping, and armed robbery.  In a new penalty phase trial, the State would not be bound by that 1984 stipulation.  In fact, the State assures us that its case in aggravation "would include the prior violent felony aggravator for Puiatti's [other] convictions."  See Fla. Stat. § 921.141(5)(b) (listing as an aggravating circumstance "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person").

Not only would the evidence about the prior attempted murder come up in the State's post-remand aggravation case, it would also be relevant to rebutting the new child abuse evidence Puiatti now wishes to present.  When Puiatti's new mental health expert, Dr. Greenberg, was cross-examined during the 2012 evidentiary hearing, he admitted that Puiatti had a high psychopathic deviant score.  He also acknowledged that research shows that high scorers on this the psychopathic deviant test tend to engage in "asocial and antisocial acts including lying, cheating, stealing, sexual acting out and excessive use of alcohol and /or other drugs."  Dr. Greenberg conceded that Puiatti engaged in antisocial acts

71

consistent with what one would expect from a high scorer on the test. Among the acts that Dr. Greenberg acknowledged were consistent with Puiatti's score on the psychopathic deviant test were: (1) the attempted murder and armed robbery that Puiatti and Glock committed the day before they murdered Ritchie; (2) Puiatti's attempts to smuggle drugs while on death row; and (3) Puiatti's placing personal advertisements on the internet, in violation of prison rules.

If Dr. Greenberg were to testify at new penalty phase trial, a similar cross-examination would occur. The high score on the psychopathic deviant test, by itself, would hurt Puiatti's case because it is damaging not mitigating. See DeYoung, 609 F.3d at1288 (noting that personality disorders involving antisocial traits "have been found not to be mitigating"); Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368 (11th Cir. 2009) (noting that "a diagnosis of antisocial personality disorder . . . is not mitigating but damaging"); Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 788 (11th Cir. 2003) (concluding that "jury might not consider mitigating" clinical diagnosis that § 2254 petitioner "was antisocial and a sociopath"); see also Looney v. State, 941 So. 2d 1017, 1028–29 (Fla. 2006) (stating "a diagnosis as a psychopath is a mental health factor viewed negatively by jurors and is not really considered mitigation").[20]

---

[20]We acknowledge that Dr. Greenberg did not necessarily diagnose Puiatti as a psychopath. However, in light of the extensive discussion of common characteristics of high scorers on the psychopathic deviant scale and how Puiatti's actions fit with the description of

72

Furthermore, the exhaustive discussion of how Puiatti's behavior was consistent with his high score on the psychopathic deviant test would cripple Puiatti's mitigation presentation. As this Court has noted, a § 2254 petitioner cannot establish prejudice when there is a "virtual certainty" that the "'good' mitigation evidence" that the petitioner wishes was presented "would have led to the introduction of 'bad' evidence." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1246 (11th Cir. 2010) (petitioner could not establish prejudice based on failure to offer testimony about his family background, when the State "assuredly would have brought out that Reed assaulted his own grandmother and threatened his brother's wife"); see also Pooler, 702 F.3d at 1275 ("Much of the 3.850 evidence Pooler claims his trial counsel . . . should have presented in the penalty phase was not mitigating but aggravating, or else would have opened the door to the introduction of aggravating evidence that would have diluted its impact."); Windom v. Sec'y Dep't of Corr., 578 F.3d 1227, 1251 (11th Cir. 2009) ("[A]ny potential benefit to be gained by presenting the relatively weak mitigating evidence in Windom's case would have been severely undercut by rebuttal evidence of his own misconduct, specifically, his involvement in a large-scale drug-dealing operation."); Wood, 542 F.3d at 1311–12 (holding that had counsel introduced

high scorers, it is unlikely that a sentencer would give weight to any difference between a formal diagnosis as a psychopath and a high score on the psychopathic deviant test. And assuredly the State this time would have more expert testimony too.

73

evidence of § 2254 petitioner's "limited intellectual functioning and special education classes," that evidence would have opened the door, inter alia, to an expert's report containing harmful information, including the petitioner's long criminal history and details about his crime); Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1004 (11th Cir. 2007) (§ 2254 petitioner alleging deficient investigation for mitigating evidence could not establish prejudice when "the fact remains that further investigation and further evidence would have opened the door to damaging personal history evidence"); Robinson v. Moore, 300 F.3d 1320, 1350 (11th Cir. 2002) (§ 2254 petitioner alleging deficient investigation for mitigating evidence could not establish prejudice when new mitigating evidence about petitioner's "loving relationships with women" would have opened the door to evidence that "five days after murdering and raping [the victim], Robinson allegedly raped and robbed another woman . . . in similar circumstances").

Not only does our precedent doom Puiatti's claim, the Supreme Court's recent decision in Wong v. Belmontes makes clear that a "'more-evidence-is-better' approach," like the one Puiatti advocates, is not always the best strategy for capital counsel. 558 U.S. at 25, 130 S. Ct. at 389. There, Belmontes argued that his counsel at his murder trial should have, inter alia, offered expert testimony about Belmontes's mental state at the time of his crime. Id. at 23–24, 130 S. Ct. at 388–89. The Supreme Court determined that, had Belmontes's attorney introduced

74

expert testimony that attempted to "explain [Belmontes's] behavior, or put[] it in some favorable context," id. at 24, 130 S. Ct. at 389, the expert would have been cross-examined regarding another murder about which there was strong evidence Belmontes committed. Id. at 17, 25, 130 S. Ct. at 389. The Supreme Court declined to find prejudice because "[a] heavyhanded case to portray Belmontes in the best possible light, with or without experts, would have invited the strongest possible evidence in rebuttal—the evidence that Belmontes was responsible for not one but two murders." Id. at 25, 130 S. Ct. at 389.

Similarly here, a "heavyhanded case" to portray Puiatti as a sympathetic victim of his parents' abuse would have invited harmful and compelling rebuttal evidence. The State would have mounted a strong rebuttal case to show that Puiatti's murder of Ritchie was not the result of abuse inflicted upon him as a child. Rather, the murder was consistent with a pattern of antisocial behavior that Puiatti had been engaging in throughout his life and which was suggested by psychological test scores.

This is not a case where the value of the mitigating evidence is so strong that it gives rise to a reasonable probability of a different outcome, notwithstanding the aggravating circumstances actually found, or that would be found on remand. For example, in Wiggins, the petitioner's mother "frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips

75

and garbage." 539 U.S. at 516–17, 123 S. Ct. at 2532–33. She also beat her children for breaking into the family's locked kitchen and "had sex with men while her children slept in the same bed." Id., 123 S. Ct. at 2533. In one instance, his mother "forced [Wiggins's] hand against a hot stove burner" resulting in Wiggins's hospitalization. Id. at 517, 123 S. Ct. at 2533. Additionally, Wiggins's foster father and siblings molested and raped him. Id., 123 S. Ct. at 2533. As an adult, Wiggins was raped by a supervisor at his job. Id., 123 S. Ct. at 2533. The Supreme Court concluded that this evidence created a reasonable probability of a different outcome, stressing that "Wiggins does not have a record of violent conduct that could have been introduced by the State to offset the powerful mitigating narrative." Id. at 537, 123 S. Ct. at 2543. Not only is Puiatti's child abuse evidence not as powerful, but Puiatti, unlike Wiggins, does have a record of violent conduct that could be used to offset the child abuse evidence. See id.

Puiatti contends that the child abuse evidence would have not only been mitigating in and of itself, but that it also would have caused the trial court to find other non-statutory mitigating circumstances, like a history of drug abuse. However, both the jury and the state trial court were well-versed in Puiatti's struggles with drugs. Various explanations were offered for Puiatti's development of a drug addiction, including: Puiatti's hanging out with the wrong crowd, the family's financial difficulties, and Puiatti's inability to become a basketball player.

76

In fact, his attorney made Puiatti's drug addiction a central aspect of her closing argument, noting "the vicious circle that he was caught in using drugs." An additional explanation for why Puiatti was addicted to drugs would have been cumulative and would not necessarily have established the finding of a non-statutory mitigating factor. See Rhode v. Hall, 582 F.3d 1273, 1287 (11th Cir. 2009) ("At best, the evidence would have been cumulative, providing more information about [the petitioner's] . . . early exposure to drugs and alcohol.").

Puiatti's crime was particularly egregious. The district court described the heinous nature of the crime, stating: "The defendants in this case shot Mrs. Ritchie, started to drive away, and then, noting she was not yet dead, turned the car around not once, but twice, to drive back to where Mrs. Ritchie was standing—bloodied and defenseless—and to execute her." The district court went on: "Each time Puiatti and Glock drove off they had the chance to leave her be. Instead, both times they returned and shot her again, in order to ensure that the life was snuffed out of her."

In the face of such a gruesome crime, Puiatti's attorney made extensive efforts to establish mitigating circumstances. She was unsuccessful. Puiatti now wishes his attorney had uncovered and presented mitigating evidence wholly different than the information presented at trial. However, the mitigating evidence that Puiatti wishes his counsel had presented would have opened the door to

77

additional negative information about Puiatti.  The damning effect of this new evidence would have blunted any mitigating effect that the child abuse evidence could have had.  Therefore, no reasonable probability exists that the trial court would have spared Puiatti's life even if it had known of his traumatic childhood.

## X.  CONCLUSION

For the reasons set forth above, we affirm the district court's denial of Puiatti's § 2254 petition.

**AFFIRMED.**

MARTIN, Circuit Judge, specially concurring:

I agree that the District Court's judgment should be affirmed but I concur only in the result reached by the Majority opinion.